623 A.2d 322

Christine FITZPATRICK, Individually and as Administratrix of the Estate of Kevin Fitzpatrick, Deceased, and Lisa Fitzpatrick,

v.

Michael MADONNA and Outboard Marine Corporation.

Appeal of OUTBOARD MARINE CORPORATION.

Superior Court of Pennsylvania.

Argued May 14, 1992.

Filed Feb. 23, 1993.

Reargument Denied April 29, 1993.

Harry A. Short, Jr., Philadelphia, for appellant.

Stephen R. Bolden, Philadelphia, for appellee.

Before WIEAND, OLSZEWSKI and HOFFMAN, JJ.

WIEAND, Judge:

In this action to recover damages for the death of a swimmer who was struck by a carelessly operated motorboat, the principal issue is whether the outboard motor on the boat was defective because it lacked a propeller guard or shield. After careful review of the evidence in this case, we conclude that there was no basis for finding the motor defective.

On the afternoon of August 10, 1980, while swimming with his sister and several friends at Pat Cong Creek Cove, near Ocean City, New Jersey, sixteen year old Kevin Fitzpatrick was struck and killed by a motorboat operated by Michael Madonna. Fitzpatrick and a friend, Lisa Wolfington, were swimming in fairly deep water when the motorboat, which was being accelerated to permit "skipping" along the water's surface by friends of Madonna,[1] passed over the area in which Fitzpatrick was swimming. As it did the sound of the motor deepened and Fitzpatrick's body momentarily came to the surface. There, Lisa Wolfington attempted unsuccessfully to hold a bleeding Fitzpatrick above water. When his body was found approximately fifteen minutes later, mouth-to-mouth resuscitation was unsuccessful, and upon removal to a nearby hospital, Fitzpatrick was declared dead.

His mother, Christine Fitzpatrick, as administratrix of her deceased son's estate, commenced wrongful death and survival actions against Michael Madonna, the operator of the boat, and against Outboard Marine Corporation (OMC), the manufacturer of the 1978 outboard motor used to propel the boat through the water. The decedent's sister, Lisa Fitzpatrick, who witnessed the accident, filed a separate count to recover for her emotional distress. Prior to trial, the claims against

1. Once the motorboat attained a certain speed, Madonna's companions would jump from the boat and "skip" like pebbles along the water's surface.

Michael Madonna were settled for the sum of one million, two hundred twenty-five thousand ($1,225,000.00) dollars.[2] During a subsequent trial, a jury found that Madonna (40%) and OMC (60%) were both negligent in contributing to Fitzpatrick's death and that OMC was also liable strictly for a defectively designed outboard motor. The motor was defective, the jury determined, because the propeller blades were not encased in a protective guard. Damages of one million ($1,000,000.00) dollars were awarded in the survival action and $15,316.99 in the wrongful death action. A separate award of ninety thousand ($90,000.00) dollars was made to Lisa Fitzpatrick for her individual claim of emotional distress. Post-trial motions were denied, and OMC appealed from the judgment entered on the verdict.

In *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978), the Supreme Court of Pennsylvania wrote the law applicable in this Commonwealth to strict liability claims for defectively designed products. The Court held that "[i]t is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint." *Id.* at 558, 391 A.2d at 1026. The initial issue, therefore, is a question of law whose resolution depends upon social policy. *Id.*, 391 A.2d at 1026. When a judicial determination has been made that recovery would be justified, a "jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Id.* at 559, 391 A.2d at 1027. See also: *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 46–53, 485 A.2d 408, 420–424 (1984), *appeal dismissed*, 508 Pa. 643, 500 A.2d 428 (1985).[3]

2. An additional twenty-five thousand ($25,000.00) dollars was paid to the decedent's sister in settlement of her separate claim for emotional damages.

3. The *Azzarello* rule has been criticized and is not followed by the courts of other states. See: *McKay v. Sandmold Sys., Inc.*, 333 Pa.Super. 235, 239–245, 482 A.2d 260, 263–266 (1984). Nevertheless, it

It has been said that in making a products liability social policy analysis, a court must possess the qualities of both a social philosopher and a risk-utility economic analyst. See: *Carrecter v. Colson Equip. Co.*, 346 Pa.Super. 95, 101 n. 7, 499 A.2d 326, 330 n. 7 (1985). The court in such cases must balance "the utility of the product against the seriousness and likelihood of the injury and the availability of precautions that, though not foolproof, might prevent the injury." *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 450, 467 A.2d 615, 618 (1983), citing *Schell v. AMF, Inc.*, 567 F.2d 1259 (3d Cir.1977). In *Dambacher by Dambacher v. Mallis, supra*, the Court attempted to identify additional factors for a court to consider when it observed as follows:

The California Supreme Court has identified the following factors: the gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; the financial cost of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design. *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 237, 573 P.2d 443, 455 (1978). Dean Wade has formulated a similar list:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe;

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of

continues to be the rule which the courts of this Commonwealth apply in resolving design defect cases.

general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

Wade, *supra* at 837–38 (footnote omitted).

*Id.*, 336 Pa.Super. at 50 n. 5, 485 A.2d at 423 n. 5.

■ After reviewing the evidence in the instant case, it seems clear that a shroud which covers the propeller of an outboard motor will, at best, reduce one type of risk while creating other undesirable effects. For instance, a propeller guard would reduce a vessel's speed and would thereby reduce its efficient use of fuel. In addition, a propeller guard will affect the maneuverability of a boat. The plaintiff's expert said that technology may have been available prior to 1978 that would enable him to envision a feasible propeller protection device, but he conceded that, in fact, no device existed prior to 1984 that he could recommend. He said that he had reviewed sixteen patented propeller guard systems and that none of them were practical, because all had a substantial degrading effect on boat performance. He also reported on tests conducted by OMC between 1969 and 1981 on suggested propeller guards. All contained aspects which affected adversely the speed and fuel efficiency of boats moving through the water.

An outboard motor is designed to move a boat through water. It has not been designed to allow motorboats to move among swimmers. The risk inherent in such movement is readily apparent. Moreover, it cannot be said with any degree of certainty that the risk of injury will be reduced by a safety guard, for the presence of a shroud over the propeller presents its own risks to swimmers. For example, a shroud creates a larger target area. In addition, the possibility exists that human limbs may become wedged between a shroud and the propeller, exposing a swimmer to even greater injury.

From recreation to transportation, the open screw propeller has proven its utility for its intended purpose, i.e., powering a

boat through the water. When used for its intended purpose, the open screw propeller functions safely and well. It must be conceded, nevertheless, that open screw propellers possess inherently dangerous qualities. The public, however, is aware of those qualities. A competent person knows that he or she must stay clear of the churning blades of an outboard motor in the same way as a person avoids airplane propellers, chain saw teeth, and lawn mower blades.

Some products, by their nature, (or, in modern parlance, by their conscious design), place both users and bystanders in some measure of danger. A knife or an axe may cut persons, as well as their intended targets. Fish hooks can wound; saws can maim, and revolving propellers can cause fearful damage.

*Elliott v. Brunswick Corp.*, 903 F.2d 1505, 1507 (11th Cir. 1990). When a boat powered by an outboard motor is handled in a common sense manner, the likelihood that bystanders will be injured by the rotating blades of the motor is not great.

Those courts which have considered this issue have refused to impose strict liability for design defect on manufacturers that have not covered their outboard motors with a protective device. In *Elliott v. Brunswick Corp., supra,* the United States Court of Appeals for the 11th Circuit said:

At trial ... the experts called by *both* parties agreed that no feasible guard existed that could be adapted readily to existing motors. For example, one of plaintiff's witnesses, Dr. Arthur Reed, a naval architect, estimated that Mercury might develop an appropriate guard after a total of ten or eleven years of effort by biomechanical engineers, hydrodynamic engineers, structural engineers, and materials engineers, followed by an additional four years of prototype testing. Dr. Reed frankly conceded, in short, that, in his view, "all of these guards need technical development before they are ready to really be marketed."

Both parties' witnesses, moreover, testified regarding potential difficulties that these devices might engender. Both groups of experts, for example, testified that the use of these guards can result in a boat's substantial loss of power

and speed, due to their added drag. Both parties' experts also testified that ring guards would create handling and steering problems; they stated that these guards, due to their circular shape, add new rudder areas in entirely new planes, thus inducing dangerous handling characteristics. Mercury's experts, moreover, testified that guards could create safety hazards. They stated that some consumers would be likely to remove the guard to gain power and promote fuel economy; a guard's removal would cause the boat to exceed its power rating, and thus would create handling difficulties.

Both parties' experts also explained that guards themselves can become a danger as they move through the water. Experts from both sides agreed that guards can entrap human limbs, increasing the risks of mutilation, amputation and drowning. One of Elliott's experts acknowledged that if a boat were moving in the 30–35 mph range, a blow to the head by one of its guards would be fatal; he also conceded that serious injuries would occur even at lesser speeds.

In short, although Elliott's experts promoted the use of propeller guards, they agreed that companies could not yet market them for general use. Both sets of experts, moreover, discussed the problems that these devices engender. Elliott's nearest approach to evidence on their utility was her videotape of the boat that struck her equipped with such a guard; Elliott's own experts, however, agreed that a satisfactory guard of this type was not available. Elliott, therefore, failed to produce evidence that Mercury had access to a safe, practical design for propeller guards at the time of her accident.

*Elliott v. Brunswick,* 903 F.2d at 1509. See also: *Beach v. Outboard Marine Corp.,* 584 So.2d 447 (Ala.1991) (following *Elliott* in a case involving a 1988 outboard motor). So, too, in the instant case, the evidence failed to show that in 1978 there was available for use a safe, practical design for a propeller guard.

We take judicial notice that the United States Coast Guard, acting on recommendation of a subcommittee of the National Boating Safety Advisory Council convened to study the use of propeller guards, determined on February 1, 1990, that it would continue to refrain from issuing any regulation that would require propeller guards on open screw propellers.[4]

The plaintiff-appellee urges, however, that if technology existed in 1978 from which her expert could envision the development of a practical propeller guard, we should hold OMC strictly liable in order to encourage manufacturers to design safe outboard motors. We decline to do so. As a matter of policy there is no good reason for imposing strict liability on OMC merely because, at the time of manufacturing the motor in this case, OMC did not encase the propeller in a protective device. No practical devices were then available, and none had been developed which would have improved the safe operation of the boat in the instant case. In 1978, an outboard motor was not defectively designed merely because the propeller was not enshrouded in a protective device.

Because the outboard motor was not defective, there also can be no liability on OMC for negligence.

> [I]n a negligence case the plaintiff must prove, *not only that the product was defective* and that the defect caused his injury, but in addition, that in manufacturing or supplying the product the defendant failed to exercise due care. The defendant is liable neither as an insurer nor guarantor but rather only for failing to act as a reasonable man would have acted. *See Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983); *Macina v. McAdams,* 280 Pa.Super. 115, 421 A.2d 432 (1980).

*Dambacher by Dambacher v. Mallis, supra* 336 Pa.Super. at 53, 485 A.2d at 424 (emphasis added).

Because of our holding, we find it unnecessary to determine whether there was evidence to show that the absence of a

4. Recently, in *Shields v. Outboard Marine Corp.,* 776 F.Supp. 1579 (M.D.Ga.1991), it was held that the Coast Guard's refusal to adopt regulations requiring the use of propeller guards was preemptive and barred plaintiff's products liability claim.

protective device was a substantial factor in causing Fitzpatrick's death or whether Fitzpatrick would, in any event, have been killed by being struck by an encased rotor. Similarly, it is unnecessary to decide whether Lisa Fitzpatrick, under the circumstances, was entitled to recover damages from OMC for the infliction of emotional distress and whether the trial court committed those trial errors assigned to it by appellant.

Judgment reversed and now entered in favor of the appellant, Ocean Marine Corporation.

HOFFMAN, J., files a dissenting opinion.

HOFFMAN, Judge, dissenting.

As I do not believe that the lower court erred in submitting the issue of a design defect to the jury, I must respectfully dissent.

In a design defect case, the court is required to engage in a risk/utility analysis prior to submission of the case to the jury *Azzarello v. Black Brothers*, 480 Pa. 547, 391 A.2d 1020 (1978). This "threshold" inquiry requires that the trial judge make an initial determination whether as a matter of social policy the case is appropriate for treatment under the rubric of products liability. *Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 228 n. 6, 545 A.2d 906, 910 n. 6 (1988). In making this determination, moreover, the trial court is to consider the following factors:

(1) the product's usefulness and desirability—its usefulness to the user and to the public as a whole; (2) the safety aspects of the product—the likelihood that it will cause injury and the potential severity of such injury; (3) the mechanical feasibility of a safer design; (4) the availability of a safer substitute product which meets the same need; (5) the economic feasibility of a safer design; (6) the manufacturer's ability to reduce or eliminate the unsafe character of the product without impairing its usefulness or rendering it too expensive to maintain its utility; (7) the user's or public's ability to avoid the danger posed by exercising care

in exposure to or use of the product; (8) the user's or consumer's anticipated awareness of the dangers inherent in the product's design and their availability resulting from general public knowledge of the obvious condition of the product or of the existence of appropriate warnings or instructions; (9) the adverse consequences to the product and to the consumer resulting from a safer design; and (10) the feasibility of permitting or requiring the manufacturer to spread the risk of loss by carrying liability insurance or by self insurance and setting the price of the product accordingly.

*See Dambacher v. Mallis,* 336 Pa.Super. 22, 50–51, 485 A.2d 408, 423 (1984).

At this preliminary stage, however, the lower court is required to view the evidence in a light most favorable to the plaintiff. *Burch v. Sears, Roebuck & Co.,* 320 Pa.Super. 444, 450–451, 467 A.2d 615, 618–619 (1983). Although the Majority espouses a commendable social philosophy in support of its decision, I do not believe proper weight was given to the plaintiff's evidence. I agree with the trial court that, as plaintiffs presented several alternate design options for consideration as well as expert testimony in support of the mechanical and financial feasibility of these designs, the issue of a design defect was properly submitted to the jury. Therefore, I respectfully dissent.