# Buongiovanni v. General Motors Corp.

C.P. of Bucks County, no. 91-01676-14-2.

*Francis S. Guarrieri* and *Larry E. Cohen*, for plaintiff.
*Evan A. Burkholder* and *Francis Grey*, for defendant.

BIESTER, *J.*, November 4, 1998—On the evening of October 2, 1989, plaintiff, Debra Buongiovanni, and an acquaintance, James Giglio, were driving east along State Route 63 (also known as Woodhaven Road) in Bensalem Township on their way to see a 9 p.m. movie at the Woodhaven Mall. Mr. Giglio was driving plaintiff's 1984 Chevrolet Chevette. Plaintiff was seated in the front passenger seat and was wearing her seat belt.

Mr. Giglio inadvertently missed the exit for the road to the movie theater. Rather than continue down the road to the next exit, Mr. Giglio decided to back up to the missed exit. He backed up the Chevette until he was at the point where he could pull off onto the exit ramp. At this time, both Mr. Giglio and the plaintiff testified that headlights illuminated the Chevette's rear-view mirror. Plaintiff testified that she turned around in her seat to look out of the rear window. Realizing that another vehicle was about to hit the Chevette, she turned back around in her seat and was facing forwards at the moment the collision occurred.

Mr. Poretti testified that he was travelling down the entrance ramp to Woodhaven Road in his wife's Honda Prelude at approximately 50 miles per hour when he saw the Chevette with its reverse lights on about 10 car lengths in front of him. He looked at his left side-view mirror to see if there was space to merge onto Woodhaven Road, but there were cars in the right lane of Woodhaven Road blocking his way. When he was approximately five car lengths behind the Chevette, Mr. Poretti realized that he was not going to be able to avoid a collision. He "slammed" on his brakes and

steered the Prelude to the left. Mr. Poretti's car hit the left rear corner of the Chevette. The Chevette spun forward and rotated to the right, travelling approximately 55 feet after the impact before coming to rest.

Upon impact, the left rear portion of the Chevette crumpled behind Mr. Giglio's seat and prevented his seat from collapsing rearward. With nothing behind her seat to support it, the plaintiff's seat collapsed rearward in approximately one-sixth of a second after the impact. Her upper body traveled partially into the rear area of the car and her head struck the interior of the Chevette in the back seat area.

The plaintiff suffered a fractured vertebra and, as a result, is now a quadriplegic. After the accident, she spent a month at Hahnemann Hospital, where she underwent surgery on her vertebra. In November 1989, the plaintiff transferred to Moss Rehabilitation, where she regained limited ability to attend to some of her personal needs, such as feeding herself, fixing her hair and brushing her teeth. In May 1990, the plaintiff moved to Magee Rehabilitation and later transferred to the New Ralston House, where she remained until September 1991. Throughout the time she spent in the hospital and in the rehabilitation centers, the plaintiff also suffered from additional complications commonly experienced by quadriplegics, including bladder infections, skin sores, pulmonary edema, pneumonia and a tracheotomy.

Since September 1991, the plaintiff has lived in her own apartment. However, she requires daily assistance for basic tasks such as getting in and out of bed, bathing, preparing food and attending to her urinary and bowel needs. She continues to experience constant pain in the area of her tailbone, buttocks and left leg.

Plaintiff filed suit against the defendant, General Motors, and others in 1991, seeking compensatory damages under theories of negligence and strict liability. The plaintiff later withdrew the negligence claim and proceeded to trial solely on the strict liability claim. The plaintiff alleged that the defendant defectively designed the 1984 Chevette front passenger seat to yield rearward in the event of a rear-end collision, thereby allowing plaintiff's upper body to move into the back seat of her car and causing her injury. Plaintiff alleged that as a result of the defective design, the vehicle was not crashworthy.

At trial, the plaintiff presented evidence that the defendant defectively designed Chevette seats to yield in rear-end collisions. The plaintiff offered expert testimony from two witnesses, Alan Cantor and Dr. Donald Friedman, that a rigid passenger seat was a safer practicable alternative seat design available in 1984. Mr. Cantor produced for the jury the actual modified seat he had created as part of an alternative design. He also presented videotapes of tests he had conducted on the modified seat and a 1984 production Chevette seat simulating rear-end collisions. Dr. John L. Melvin, qualified as an expert in the field of medicine and physical rehabilitative medicine, in particular with spinal cord injuries, testified regarding the severity and extent of plaintiff's injury. Dr. Carly Ward, a biomechanical engineer, testified that plaintiff's injuries resulted from the collapse of her seat, which allowed her head to hit the interior portion of the Chevette and her body to compress into her neck, thereby causing a fracture of her vertebra.

The defendant presented evidence that, based on repeated testing of seat performance in rear-end collisions, it had properly determined that yielding seats were safe,

particularly in the event of a rear-end collision in which the seat occupant is out of position. Brent Benson, qualified as an expert in the areas of accident reconstruction, seat performance, particularly with regard to rear impacts, and occupant movement in various seating systems in connection with rear impacts, testified about the safety benefits of a yielding seat design. Dr. William R. Scott, a biomechanical engineer, testified on behalf of the defendant that the type of fracture suffered by the plaintiff indicated that she was not in her seat facing forward at the time of the accident, but rather was out of position. The defendant also presented testimony from a number of witnesses that, following the accident, the upper portion of plaintiff's body was positioned between the driver and passenger seats. Dr. Joseph Rice, an employee of General Motors, testified that the defendant weighed the benefits and risks of a yielding seat design versus a rigid seat design and, based on their research, determined that the yielding seat was the safer design.

At the close of the plaintiff's evidence, the defendant moved for a directed verdict, in part on the grounds that the plaintiff had failed to prove that the Chevette seat was unreasonably dangerous. We denied the defendant's motion. The defendant repeated this motion at the close of all of the evidence, which we again denied. After the plaintiff's counsel completed his closing argument, the defendant moved for a mistrial, arguing that the plaintiff's counsel had made repeated prejudicial and unsubstantiated references to the defendant's knowledge and conduct, concepts which are irrelevant in a strict liability case. After careful consideration, we denied the defendant's motion for a mistrial and issued a curative instruction to the jury.

We found that recovery would be justified under the plaintiff's averment of the facts and therefore submitted the case to the jury. The jury returned a unanimous verdict in favor of the plaintiff in the amount of $28 million.

This matter now comes before this court upon defendant's post-trial motions requesting judgment n.o.v., a new trial, or, alternatively, remittitur of the jury's verdict.

## ISSUES

## I.

Defendant first argues that it is entitled to judgment n.o.v. on two grounds. Defendant contends that this court erred as a matter of law and public policy under *Azzarello v. Black Brothers Co. Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978), by concluding that the Chevette front passenger seat could be deemed defective and unreasonably dangerous. Additionally, defendant argues that the plaintiff failed to prove that a safer, practicable alternative seat design existed in 1984 that would have reduced or prevented her injuries.

Judgment n.o.v. is appropriate only when there is insufficient competent evidence in the record to support the jury's verdict. *Johnson v. Hyundai Motor America,* 698 A.2d 631, 635 (Pa. Super. 1997). This court must review the evidence in the light most favorable to the plaintiff and may disturb the jury's verdict only if the evidence and all reasonable inferences drawn therefrom reveal that no two reasonable persons could fail to agree that the jury's verdict was improper. *Id.; Gregg v. Lindsay,* 437 Pa. Super. 206, 209, 649 A.2d 935, 937 (1994); *Pirozzi v. Penske Olds-Cadillac-GMC Inc.,* 413 Pa. Su-

per. 308, 312, 605 A.2d 373, 375 (1992), *allocatur denied,* 532 Pa. 665, 616 A.2d 985 (1992).

A. *The trial court properly concluded that the seat was unreasonably dangerous under* Azzarello.

Defendant first argues that the court erred in finding that the front passenger seat could be deemed unreasonably dangerous and defective. Therefore, defendant contends that the court should not have submitted the case to the jury, and defendant is entitled to judgment n.o.v.

Plaintiff alleges that the defendant is strictly liable for a design defect in the front passenger seat of her 1984 Chevette which caused the seat to collapse backward after her automobile was struck from behind by Mr. Poretti's Honda Prelude. In addressing the issue of strict liability in products liability claims, our Commonwealth courts have adopted section 402A of the Restatement (Second) of Torts.[1] *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). The plaintiff in a products liability case has the burden to prove that (1) the product

---

1. Section 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." Restatement (Second) of Torts §402A (1965).

was defective, (2) the product was defective when it left the defendant's hands, and (3) that the defect caused harm to the plaintiff. *Riley v. Warren Manufacturing Inc.,* 455 Pa. Super. 384, 390, 688 A.2d 221, 224 (1997) (citing *Ellis v. Chicago Bridge & Iron Co.,* 376 Pa. Super. 220, 235, 545 A.2d 906, 909 (1988)).

There are two ways that a plaintiff can establish that a product is defective. The plaintiff may demonstrate a breakdown in the product or one of its components, traditionally known as a manufacturing defect. *Riley,* 455 Pa. Super. at 390, 688 A.2d at 224. Alternatively, the plaintiff may offer proof of a design defect which renders the product unreasonably dangerous for its intended use. *Id.* In instances of an alleged design defect, a "product may be deemed to be 'defective' even though it comports in all respects to its intended design." *Azzarello,* 480 Pa. at 555, 391 A.2d at 1024-25. The plaintiff in this case alleged a design defect, claiming that the front passenger seat in the 1984 Chevette was not crashworthy and therefore was unreasonably dangerous for its intended use.

The trial court has more extensive control over jury action in a products liability case than in a negligence action. *Riley,* 455 Pa. Super. at 389, 688 A.2d at 224 (citing *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 47, 485 A.2d 408, 422 (1984)). The threshold question of whether plaintiff's averment of the facts demonstrates the product to be unreasonably dangerous is a matter of law for the court to decide. *Azzarello,* 480 Pa. at 558, 391 A.2d at 1026. It is only after the court has found a product to be unreasonably dangerous that it may submit the case to the jury to determine whether the facts of the case support the plaintiff's complaint. *Id.* The term "unreasonably dangerous" does not hold the same meaning in products liability cases

as it does in common parlance. *Id.* at 554, 391 A.2d at 1024. Rather, it is merely a label used when the court determines that the supplier of the product should bear the risk of loss. *Id.* at 556, 391 A.2d at 1025.

In determining whether the plaintiff has shown a product to be unreasonably dangerous, the court employs a risk-utility economic analysis in accordance with social policy. *Riley,* 455 Pa. Super. at 390, 688 A.2d at 224. This risk-utility analysis involves weighing "the utility of the product against the seriousness and likelihood of the injury and the availability of precautions that, though not foolproof, might prevent the injury." *Fitzpatrick v. Madonna,* 424 Pa. Super. 473, 476, 623 A. 2d 322, 324 (1993). Our Pennsylvania Superior Court has identified a number of considerations to guide courts in making this determination.

The plaintiff need not fulfill all of these factors; they are "merely suggestions" for the trial court to consider:

"(1) The usefulness and desirability of the product— its utility to the user and to the public as a whole.

"(2) The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.

"(3) The availability of a substitute product which would meet the same need and not be as unsafe.

"(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

"(5) The user's ability to avoid danger by the exercise of care in the use of the product.

"(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition

of the product, or of the existence of suitable warnings or instructions.

"(7) The feasibility on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance." *Riley,* 455 Pa. Super. at 391-92, 688 A.2d at 225 (citing *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 50 n.5, 485 A.2d 408, 423 n.5 (1984); Dean John Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 837-38 (1973)).

We find that the evidence clearly supports the court's finding that the front passenger seat was unreasonably dangerous.

Clearly, the public has a significant interest in ensuring that automobile manufacturers will design seats which will protect passengers in rear-end collisions. In a rear-end collision, the vehicle accelerates at a speed faster than the passengers within the vehicle. One of the primary functions of the front seats is to prevent injury by restraining the passenger in the seat.

The injuries suffered by the plaintiff illustrate the gravity of the danger posed by the design of a front seat which allows it to collapse backward in a rear-end collision such as one experienced by the plaintiff. As a result of the accident, plaintiff's a quadriplegic. Her condition is permanent. Dr. Carly Ward, a biomechanical engineer, testified that plaintiff's injuries are "terrible" and "debilitating injuries in the extreme." (R. at vol. IX (morning session), 81.) The plaintiff requires assistance with the most basic of needs. She has also suffered from a host of other ailments associated with her quadriplegia such as bladder infections, skin sores and pulmonary infections. (R. at vol. III, 203-204, 206, 207.)

In addition, defendant's own reports recognize the serious hazards posed by designing front passenger seats to yield in rear-end collisions. These reports cite quadriplegia, paraplegia and even death as potential injuries resulting from yielding seats. The likelihood that this design would cause serious injury, including the injury suffered by the plaintiff, in the event of a rear-end collision is well documented.

A December 1966 report titled "Report of Safety Design Progress, Oldsmobile Division" revealed that "[r]unning the test vehicle rearward into a fixed barrier at 30 miles per hour provides a repeatable test which permits a valuation of crash characteristics under conditions of high severity. . . . *Survival is largely dependent upon front seat structure which will maintain the passenger in an upright·seated position.*" (R. at vol. VI, 33-34.) (emphasis added)

Another General Motors report titled "Whiplash Protection Study Part VI, June 19, 1968" also warned of the hazards posed by seats which collapse rearward:

"Other problems are associated with getting the occupant to the horizontal position. One of these is the *high probability of interference with rear seat occupants.* This condition has the potential of severe injury to either one or both of the occupants. Even if the rear seat occupant was not present, a potential hazard can exist from the high compressive loads imposed on the cervical spine of the occupant's head as the occupant's head is being forced into the rear back cushion." (R. at vol. VI, 34-35.) (emphasis added)

A third General Motors document dated March 12, 1982 revealed:

"The current accident statistics show that neck injuries are a very low frequency event in rear-end collisions and are usually associated with relatively large changes

in velocity of the struck vehicle. Even though such injury is a low frequency event, *the possible consequences of cervical injury leading to quadriplegia or paraplegia is obviously of a significant concern in the injury prevention and improved protection of car occupants.*" "Influence of Seat Back Angle on Occupant Dynamics in Simulated Rear-End Impacts," March 12, 1982. (R. at vol. IX (morning session), 71-73.) (emphasis added)

We also find that there is ample evidence of the mechanical feasibility of designing a safer seat in 1984. It is on this issue that the defendant primarily focuses his challenge to our finding that the Chevette seat was unreasonably dangerous.

With respect to the issue of feasibility, both Alan Cantor, who had inspected hundreds of seat designs throughout his career,[2] and Donald Friedman, testified to the mechanical feasibility of designing a rigid seat in 1984. The defendant agrees that it was feasible to design a rigid seat in 1984. The defendant's primary contention is that the plaintiff failed to meet her burden of proving that a rigid front passenger seat is safer overall than a yielding front passenger seat. At best, the defendant argues, the plaintiff demonstrated that a rigid seat would provide safety benefits in some instances, but would create additional risks in other accident scenarios, in particular, those involving out-of-position passengers in rear-end collisions.

In support of its argument, defendant cites *Fitzpatrick v. Madonna,* 424 Pa. Super. 473, 623 A.2d 322 (1993),

---

2. Mr. Cantor testified that, in the course of his career, he had tested hundreds of seats, both in aircraft and in automobiles, and that, of all of these seats, "[t]he Chevette was the weakest seat I ever tested." (R. at vol. IV (afternoon session), 81.)

in which the plaintiff brought a claim against a boat manufacturer after her son was killed by a boat propeller while swimming in deep water off the coast of Ocean City, New Jersey. The plaintiff argued that the defendant should have provided a shroud to cover the propeller blades. The court found that a shroud would not make the propeller safer, explaining that a shroud would "reduce one type of risk while creating other undesirable effects." *Id.* at 477, 623 A.2d at 325. Likewise, defendant in this case argues, plaintiff's proposed alternative designs, while possibly alleviating some of the risks associated with a yielding seat, will not protect out-of-position occupants as well as a yielding seat.

We are not persuaded by defendant's argument. Under *Riley,* the plaintiff has the burden to demonstrate that the defendant's product is unsafe. *Riley,* 455 Pa. Super. at 390, 688 A.2d at 224. In addition, one of the factors that this court *may* take into consideration in determining whether the plaintiff has demonstrated the Chevette seat to be unreasonably dangerous is whether the plaintiff has shown that a *safer* alternative design existed in 1984. *Id.* at 391, 688 A.2d at 225. The proposed alternative design need not necessarily be the safest design. The plaintiff need only show that her proposed alternative design is safer than the defendant's product.

*Fitzpatrick* is readily distinguishable from this case. In that case, the court recognized that a boat propeller is an inherently dangerous product and that the public recognizes it as such. The court noted:

"An outboard motor is designed to move a boat through water. It has not been designed to allow motorboats to move among swimmers. The risk inherent in such movement is readily apparent. Moreover, it cannot be said with any degree of certainty that the risk of injury will be reduced by a safety guard . . .

It must be conceded, nevertheless, that open screw propellers possess inherently dangerous qualities. The public, however, is aware of those qualities. A competent person knows that he or she must stay clear of the churning blades of an outboard motor in the same way as a person avoids airplane propellers, chain saw teeth, and lawn mower blades. . . . When a boat powered by an outboard motor is handled in a common sense manner, the likelihood that bystanders will be injured by the rotating blades of the motor is not great." *Fitzpatrick,* 424 Pa. Super. at 477-78, 623 A.2d at 325.

Because of its inherently dangerous quality, the court found it to be difficult to make the product safer and that, in this instance, a propeller shroud posed its own hazards. Rather, the court found that the best protection against injury from the boat propeller was simply proper use by boat operators and avoidance by swimmers.

Clearly, an automobile seat is not an inherently dangerous product and avoidance by the public is not a sensible solution. The challenge of creating a safer alternative design does not rise to the level of attempting to alleviate the danger inherent in products such as boat propellers, chain saws and lawn mower blades. We find that plaintiff in this case provided sufficient evidence that the yielding seat designed by the defendant was unsafe and that a rigid seat design would provide more protection and therefore would be safer than a yielding seat. With respect to the issue of the unsafe nature of the Chevette seat, there was testimony that there was no safety benefit to having the production Chevette seat perform as it did in the accident, that the production seat was defective and that there were alternative designs available in 1984 that would have

made the seat safe. (R. at vol. IV (afternoon session), 80, 89-90.)[3] The plaintiff also offered testimony regarding tests conducted by researchers at UCLA in 1969 involving test crashes with dummies at speeds up to 50 miles per hour. Based on the results of these tests, the researchers recommended that rigid front seats with high headbacks be included in all automobiles. (R. at vol. VI, 37-38.)

The evidence supports our finding that the plaintiff demonstrated that a rigid seat design was a safer and mechanically feasible design in 1984. Mr. Cantor testified that the Volvo 700 series used a rigid seat design at the time, which would have prevented plaintiff's injuries. Mr. Cantor also presented to the jury a rigid "modified" seat he designed as an example of a safer seat design that was mechanically feasible in 1984 as well as videotapes which showed testing of the seat to demonstrate its performance in rear-end collisions. These videos revealed that the rigid seat would remain upright at a much higher change in velocity than would the yielding seats. Furthermore, the evidence demonstrated that there was a direct correlation between the injury suffered by the plaintiff and the design of the Chevette seat which allowed it to yield in the event of a rear-end collision and that the plaintiff would not have suffered her injury had her seat remained upright.

---

3. Mr. Cantor testified:

"Q: . . . Mr. Cantor, is there in your opinion a safety benefit to the design of the Chevette production seat that allows it to perform as it did in both your testing and in the crash involving Debra Buongiovanni?

"A: No, there is no safety benefit at all. We just have something that broke." (R. at vol. IV (afternoon session), 80.)

In addition, cost was not a prohibitive factor in remedying the unsafe characteristic of the Chevette seat. Mr. Friedman testified that the modified seat in his Research Safety Vehicle cost approximately $14. (R. at September 16, 1997 (morning session), 89.) Mr. Cantor designed his modified seat simply by adding additional metal to the seat to strengthen it. (R. at vol. VI, 140-41.)

For the foregoing reasons, we find that the plaintiff met her burden of demonstrating that the Chevette seat was unreasonably dangerous. Therefore, the motion for judgment n.o.v. on the grounds that the court improperly submitted the case to the jury is denied.

B. *The plaintiff presented sufficient evidence of the existence of an alternative, safer practicable design.*

Defendant also argues that the court should enter judgment n.o.v. because plaintiff failed to provide sufficient evidence that an alternative, safer practicable seat design existed at the time General Motors manufactured the Chevette which would have reduced or prevented plaintiff's injuries.

Plaintiff alleged that the front passenger seat in which she was riding was not crashworthy. Crashworthiness is a subset of products liability law which provides that automobile manufacturers have a duty to design and manufacture vehicles to be reasonably crashworthy. *Kupetz v. Deere & Co. Inc.,* 435 Pa. Super. 16, 26, 644 A.2d 1213, 1218 (1994). Under the doctrine of strict liability, a design is defective when the product is not fit for its intended purpose. *Azzarello,* 480 Pa. at 559, 391 A.2d at 1027.

The crashworthiness doctrine includes accidents among the "intended" uses of automobiles. *Kupetz,* 435 Pa. Super. at 27, 644 A.2d at 1218 (1994) (citing *Barris*

*v. Bob's Drag Chutes & Safety Equipment Inc.,* 685 F.2d 94, 98 (3d Cir. 1982)).

To prevail on a crashworthiness theory, the plaintiff must establish: "(1) that the design of the vehicle was defective and that when the design was made, an alternative, safer design practicable under the circumstances existed; (2) what injuries, if any, would have resulted to the plaintiff had the alternative, safer design, in fact, been used; and (3) some method of establishing the extent of plaintiff's enhanced injuries attributable to the defective design." *Id.* at 27-28, 644 A.2d at 1218 (citing *Dorsett v. American Isuzu Motor Inc.,* 805 F. Supp. 1212, 1218 (E.D. Pa. 1992)).

Defendant admits that it was feasible to construct a rigid front passenger seat for the Chevette in 1984. (R. at vol. I, 118.) However, defendant argues that plaintiff failed to provide evidence that any of its proffered alternative designs would have reduced or prevented her injuries altogether. (R. at vol. I, 120.)[4]

We find that there is ample evidence from which a reasonable jury could determine that plaintiff met its burden with regard to this issue.

Alan Cantor testified on behalf of the plaintiff about two safer, practicable alternative designs. First, Mr. Cantor testified that the seat used in the Volvo 700 series

---

4. The record reflects defendant's position with respect to this issue:

"Mr. Burkholder [counsel for defendant]: General Motors does not contest the feasibility of designing a seat that was stiffer or more rigid. . . .

"Mr. Burkholder: . . . we do hotly contest whether a stiffer or more rigid seat would have affected the injuries that Ms. Buongiovanni received. . . ." (R. at vol. I, 118, 120.)

in 1984 would not have collapsed in the accident in which plaintiff was involved. (R. at vol. VI, 45.)

Alan Cantor also produced for the jury a "modified" rigid seat he designed.[5] The defendant argues that Mr. Cantor did not sufficiently test his modified seat. We find no merit in this argument. Mr. Cantor conducted static pull tests in accordance with the standards set forth in the Federal Motor Vehicle Safety Standard 207 test on both his modified seat and a 1984 production Chevette seat. (R. at vol. IV (afternoon session), 49.) The results of his testing revealed that the 1984 production Chevette seat could withstand a force of 520 pounds. (R. at vol. VI, 116.) Mr. Cantor testified that these results show that if a person of the same weight as plaintiff was sitting in the seat, the seat could be expected to fail and collapse backwards in an accident in which the car is hit from behind by another vehicle and experiences a change in velocity of eight miles per hour. (R. at vol. IV (afternoon session), 57; vol. VI, 118, 119.) Mr. Cantor's testing also revealed that his modified seat could withstand a force of 2,050 pounds. (R. at vol. IV (afternoon session), 63.) In a rear-end collision in which a person of the same weight as plaintiff was sitting in the modified seat, the modified seat would remain upright until the car experienced a change in velocity of approximately 30 miles per hour, at which point the seat would bend backwards, but would not completely collapse. (R. at vol. IV (af-

---

5. Although Mr. Cantor conceded that the modified seat he produced in court was not itself production ready, he revealed that only a few minor modifications were needed to make it so. (R. at vol. VI, 23, 138-39.) Mr. Cantor further testified that he had created an alternative feasible design for this case, and that the modified seat that he produced in court was one part of that design. (R. at vol. VI, 138.)

ternoon session), 63; vol. VI, 118-20.) Mr. Cantor further testified that the materials he used to create his alternative modified seat design were technologically available and practicable in 1984. (R. at vol. VI, 24, 141.)

The plaintiff also offered the testimony of Donald Friedman, whose company Minicars designed an automobile named the Research Safety Vehicle from 1974 through 1980. Mr. Friedman testified that the purpose of the Research Safety Vehicle was to "demonstrate the technology that was available to provide protection in all accident modes." (R. at September 16, 1997 (morning session), 63) and that in creating the Research Safety Vehicle, he developed "an alternative technologically feasible seat system to provide crashworthy protection for front occupants in rear impacts." (R. at September 16, 1997 (morning session), 84.) Based on this evidence, we find that the plaintiff met her burden of showing that an alternative, safer practicable seat design was available in 1984.

We also find that there is sufficient evidence that a rigid seat would have reduced or prevented the injuries suffered by the plaintiff. Dr. Carly Ward, a biomechanical engineer produced by the plaintiff, testified that there was a correlation between the spinal cord injury suffered by the plaintiff and the rear-end collision and collapse of her seat. (R. at vol. IX (morning session), 62-64.)[6] She also testified that the plaintiff would not

---

6. Dr. Ward testified as follows:

"Q: Dr. Ward, in terms of the issue of human tolerance to injury and specifically to neck injury, do you have an opinion whether or not there is a correlation between the injury, spinal cord injury, spinal cord injury in a rear-end crash and seat back collapse?

"A: Yes, there is a correlation. Any time that a body can get lined up so that the head is stopped and the body keeps coming,

have sustained the injury she did had she been seated in a rigid seat during an accident in which the delta V was 30 miles per hour. (R. at vol. IX (afternoon session), 44-45.)

## II.

*A. Defendant was not prejudiced by remarks made by plaintiff's counsel during his opening and closing argument.*

Defendant argues that this court should grant a new trial because of repeated remarks made by plaintiff's counsel during his opening and closing statements suggesting that defendant knew of the seat design defect prior to plaintiff's accident and failed to correct it. Defendant correctly asserts that knowledge and due care are negligence concepts which are irrelevant in a strict liability case. *Childers v. Power Line Equipment Rentals Inc.,* 452 Pa. Super. 94, 105, 681 A.2d 201, 207 (1996). The defendant also asserts that the plaintiff's counsel referred to matters in his closing argument that were not in evidence.

Because we observed plaintiff's counsel's conduct firsthand, this court is in the best position to determine whether any comments made by counsel during the course of the trial were so prejudicial as to warrant a new trial. See *Stevenson v. General Motors Corp.,* 513 Pa. 411, 425-26, 521 A.2d 413, 420 (1987) (noting trial court has advantage over appellate court of having observed incidents at trial). We believe that plaintiff's counsel made a number of, at the least, unfortunate

---

just like a diving accident, any time it can do that in a car, there's a high potential for injury. So when the seat goes back in a rear impact, that condition is created." (R. at vol. IX (morning session), 62-64.)

comments during his closing remarks. However, under the totality of the circumstances, we find that the statements challenged by defendant do not warrant the granting of a new trial. Defendant concedes that throughout the course of the trial, this court refused to admit evidence regarding defendant's alleged knowledge of a design defect or due care in remedying the alleged defect. (Def.'s mem. supp. mot. post-trial relief, at 24.) Therefore, the jury did not hear evidence regarding these issues. In addition, the court took care to instruct the jury that *"[t]he focus of this area of the law lies not on conduct. That's irrelevant to you. It lies on the product and the design itself."* (R. at September 24, 1997, 163.) (emphasis added) The court further safeguarded against any improper prejudice by instructing the jury "[i]f an attorney in a closing address to you speaks to evidence which you have not seen or have not heard, those words of the attorney don't count." (R. at September 24, 1997, 151.)

Under the totality of the circumstances, including the sufficiency of the evidence supporting plaintiff's strict liability claim as well as this court's due care to ensure that the jury was not prejudiced by any evidence or remarks which might improperly influence its verdict, we find that defendant is not entitled to a new trial on these grounds.

B. *The court properly instructed the jury.*

Defendant next argues that the court failed properly to instruct the jury on the probative value of defendant's compliance with the Federal Motor Vehicle Safety Standards (FMVSS), that such an error was highly prejudicial and that this court should therefore grant a new trial.

Defendant requested the court to provide the jury with the following instruction:

"General Motors have introduced evidence that the design of the 1984 Chevrolet Chevette met or exceeded all applicable Federal Motor Vehicle Safety Standards. Compliance with Federal Motor Vehicle Safety Standards is evidence which you can use to assess the safety of the Chevette's design." Proposed points for charge of defendant, General Motors Corporation, 13.

We find defendant's proffered instruction to be incomplete and potentially misleading.

In deciding whether the court properly instructed the jury, we are guided by *Jackson v. Spagnola,* 349 Pa. Super. 471, 503 A.2d 944 (1986), in which the passenger in an automobile brought a claim against the automobile manufacturer for injuries she suffered after the seat in which she was riding collapsed in a rear-end accident. The trial court in that case properly allowed the defendant to present evidence of his compliance with the FMVSS. *Id.* at 479, 503 A.2d at 948. The court refused, however, to give the jury the plaintiff's proposed instruction that the jury should not consider defendant's compliance with FMVSS in determining whether the automobile was defective. *Id.* at 480, 503 A.2d at 948. The Pennsylvania Superior Court affirmed the trial court's ruling and found the court's instruction regarding strict liability to be proper.[7] The appellate court noted

_____

7. The trial court provided the jury with the following instruction:

"Liability is sought against Volkswagen on the theory that they are the sellers and manufacturers of a defective product. The law provides that the seller or manufacturer of a product is the guarantor of its safety. The product must, therefore, be provided with every element necessary to make it safe for use and without any condition that makes it unsafe.

If you find that the product at the time it left the defendant Volkswagen's control lacked any element necessary to make it safe for use, or contained any condition that made it unsafe for use, then

that the trial court has wide latitude in charging the jury provided that it fully conveys the law of the case. *Id.* at 480-81, 503 A.2d at 949 (citing *Burch v. Sears, Roebuck & Company,* 320 Pa. Super. 444, 467 A.2d 615 (1983)).

In the present case, the court modeled its instruction to the jury on the instruction provided by the court in *Jackson:*

"The focus of this area of the law lies not on conduct. That's irrelevant to you. It lies on the product and the design itself.

"What's a 'defect'? *The manufacturer of a product is a guarantor of that product's safety. The product must therefore be provided with every element necessary to make it safe for its intended use and without any condition that makes it unsafe for its intended use.*

"I tell you that for our purposes here 'intended use' includes the experience of a crash and gets us into the concept of crashworthiness which I'll explore with you in more detail in a few moments.

*"If you find that the product at the time it left the defendant's control lacked any element necessary to make it safe for its intended use—which I tell you includes a crash—or contained any condition that made it unsafe for its intended use—which I tell you includes a crash—then the product was defective and the defendant is liable for all harm caused by such a defect.*

"A product must be designed to have every element necessary to make it safe for use and to be without any condition that makes it unsafe for use when it leaves the manufacturer's control.

---

the product was defective and the defendant is liable for all harm caused by such a defect." *Jackson,* 349 Pa. Super. at 480, 503 A.2d at 949.

"If you find that the right front seat of this 1984 Chevrolet Chevette was designed defectively, the defendant is liable for all harm caused by such defective condition." (R. at September 24, 1997, 163-65.) (emphasis added)

We find that the instructions provided by the court to the jury were proper and did not fail as a matter of law. The instructions fully conveyed to the jury the law of the case.

C. *The court properly excluded Mr. Giglio's driving record.*

Defendant claims that the court erred in refusing to allow it to present evidence of Mr. Giglio's driving record to impeach his testimony during the following exchange on re-direct examination:

"Q: . . . Let me ask you this. Whatever time it took you to back up that vehicle on the shoulder of the road, at any point as you were backing up there—was there a point you stopped because you were concerned about the traffic around what you were doing?

"A: I don't believe that there was any traffic during the time I was backing up or, if there was, it was minimal. There may have been a car or two in the fast lane, but to the best of my knowledge it seemed like it was safe to back up at the time or I wouldn't have done it. *I mean, I am committed to safe driving to the best of my ability.*" (R. at vol. III, 58.) (emphasis added)

The admission and exclusion of evidence will not be disturbed unless the trial court clearly abused its discretion. *Peled v. Meridian Bank,* 710 A.2d 620, 625 (Pa. Super. 1998) (citing *Moran v. G. & W.H. Corson Inc.,* 402 Pa. Super. 101, 125, 586 A.2d 416, 428 (1991), *allocatur denied,* 529 Pa. 650, 602 A.2d 860 (1992)).

In general, "the practice is uniform that [a] party's examination is normally limited to answering any new matter drawn out in the next previous examination of the adversary." *Hawthorne v. Dravo Corp., Keystone Division,* 352 Pa. Super. 359, 374, 508 A.2d 298, 306 (1986) (citing *McCormick on Evidence,* §32 at 69 (3d ed. 1984)). As the quote above reflects, Mr. Giglio's remarks concerning his commitment to safe driving were not responsive to the question posed by plaintiff's counsel. His statement was surplusage and, as such, defendant was not entitled to impeach it.

Even if this were not so, introduction of Mr. Giglio's driving record would be inadmissible as evidence of prior bad acts for purposes of impeachment. In Pennsylvania, witnesses may not be impeached with evidence of prior bad acts not resulting in a conviction that reflect upon truthfulness. *Commonwealth v. Tyler,* 402 Pa. Super. 429, 436-37, 587 A.2d 326, 329 (1991) (citing *Commonwealth v. Hansell,* 185 Pa. Super. 443, 137 A.2d 816 (1958)). In addition, a witness may not be impeached by evidence of prior convictions that do not involve false statements or dishonesty. *Commonwealth v. Randall,* 515 Pa. 410, 415, 528 A.2d 1326, 1329 (1987).

Furthermore, the jury could easily infer from the evidence that Mr. Giglio was not a safe driver. This accident occurred at night on a six-lane roadway. (R. at vol. II, 146, 181; vol. III, 18.) Officer Oscovitch testified that the accident took place in the extreme right lane of State Route 63. (R. at vol. II, 153.) Driving one's automobile in reverse along a heavily travelled road at night was, of course, unsafe, and any reasonable jury would realize this in light of the evidence in this case. Defendant was in no way prejudiced by the exclusion of Mr. Giglio's driving record.

### D. *The jury's verdict was not excessive.*

The defendant's next argument is that the size of the jury's verdict is excessive and should therefore be set aside or subject to remittitur.

It is the function of the finder of fact to determine the amount of damages that should be awarded. This court must use extreme caution in reviewing whether to reduce or set aside the jury's verdict. Our Pennsylvania Superior Court has warned that "[i]t is the duty of the trial court to enforce the jury's verdict and to interfere only 'when the circumstances cry for judicial interference.' " *Prather v. H-K Corp.,* 282 Pa. Super. 556, 565, 423 A.2d 385, 389 (1980) (citing *James v. Ferguson,* 401 Pa. 92, 162 A.2d 690 (1960)).

To set aside or reduce a jury's verdict, the reviewing court must initially find the amount of the damages awarded to be excessive. "Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." *Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994). The test is "whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Id.*

It is well established in Pennsylvania that "the large size of a verdict is in itself no evidence of excessiveness." *Sprague v. Walter,* 441 Pa. Super. 1, 69, 656 A.2d 890, 924 (1995) (citing *Layman v. Doernte,* 405 Pa. 355, 363, 175 A.2d 530, 534 (1962)). Our Pennsylvania Superior Court has set forth several factors that are relevant to the determination of whether a verdict is excessive: "(1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence instead of merely the subjective testimony

of the plaintiff, (3) whether the injury will affect the plaintiff permanently, (4) whether the plaintiff can continue with employment, (5) the size of the plaintiff's out-of-pocket expenses, and (6) the amount plaintiff demanded in the original complaint." *Doe v. Raezer,* 444 Pa. Super. 334, 341-42, 664 A.2d 102, 105-106 (1995) (citing *Christides v. Little,* 274 Pa. Super. 343, 348, 418 A.2d 438, 440 (1980)); see also, *Haines,* 536 Pa. at 457, 640 A.2d at 370 (noting that our Pennsylvania Superior Court has suggested these six factors).

First, we note that the plaintiff presented evidence that the amount of her past and projected economic damages totalled $13,077,467.64.[8] In addition to this amount, the jury could appropriately consider the pain and suffering and loss of life's pleasures the plaintiff has experienced thus far and will continue to experience for the remainder of her life in fixing the amount of damages to award.

There is no dispute in this case that the injuries suffered by the plaintiff are severe. In addition to her own testimony, the plaintiff presented the testimony of her parents, Evelyn and Bernard Buongiovanni, Dr. John Melvin and Dr. Carly Ward, all of whom testified as to the severity of the plaintiff's condition. The plaintiff is permanently disabled. She is unable to perform tasks such as getting in and out of bed, preparing food for herself, and attending to many of her physical needs. Although she has her own apartment, the plaintiff re-

---

8. The evidence presented the following breakdown of damages: up to $11,548,697 for projected future medical care costs (exhibit P-339); $609,231.64 in past medical expenses (exhibit P-24); $194,622 for past lost earnings (R. at vol. IX (morning session), 21); $752,391 for future lost earnings, with a 1 percent increase for productivity; and $167,148 for lost fringe benefits (R. at vol. IX (morning session), 21-22).

quires round-the-clock assistance of others. She continues to suffer from pain associated with the injury she suffered in the accident. The plaintiff was 33 at the time of the accident. Because her injury is expected only minimally to reduce her projected life expectancy, the plaintiff will most likely live at least another 20 to 30 years in her condition. The severe injury suffered by the plaintiff and the accompanying intangible losses she has suffered are of the type which warrant a significant award of damages.

In *Haines,* 536 Pa. 452, 640 A.2d 367 (1994), the plaintiff successfully brought a claim against several defendants for injuries she suffered as a result of an accidental shooting. In affirming the en banc trial court's remittitur of the amount of damages awarded by the jury for pain and suffering from $8,000,000 to $5,000,000, the Pennsylvania Supreme Court quoted the lower court's rationale:

"As noted, Tamika Haines suffered catastrophic injuries. In essence she has been deprived of the ability to have normal relationships with other human beings. She suffered major memory loss, loss of cognitive abilities, and has trouble walking and using her arms. . . .

"On the other hand, she is not in any physical pain, does relate to her family, goes by herself to remedial classes, and can carry out some activities. *She is not in the same class as someone who is a quadriplegic or in great pain that cannot be treated." Id.* at 456, 640 A.2d at 369. (emphasis added)

This court finds ample evidence in the record which supports the amount of damages awarded by the jury in this case. The amount of the award does not shock the conscience of this court. We find that the jury faithfully fulfilled its duty in this case and that the determination of the amount of damages properly rests with its members.

E. *The jury's verdict was not against the weight of the evidence.*

The defendant's final argument is that the verdict is against the weight of the evidence because the plaintiff failed to show that the Chevette seat was defective or that the alleged defect caused plaintiff's injuries. We disagree.

"It is the province of the jury to weigh the competing evidence produced at trial, and that function should not be disturbed by the trial court." *Sheely v. Beard,* 696 A.2d 214, 219 (Pa. Super. 1997). The jury in this case unanimously found that the Chevette seat was unsafe, defective and caused the plaintiff's injuries. As we have previously explained, the plaintiff provided sufficient evidence to support the jury's verdict on both of these issues.

For the foregoing reasons, we deny defendant's motion for post-trial relief.