688 A.2d 221

Rickey L. RILEY, and Joan M. Riley, Coby J. Riley,
a minor, by Rickey L. Riley and Joan M. Riley,
his guardians, Appellants,

v.

WARREN MANUFACTURING, INC., Agricultural Commodities,
Inc. and A.W. Stauffer & Sons, Inc., Appellees.

Superior Court of Pennsylvania.

Argued Sept. 10, 1996.

Filed Jan. 21, 1997.

386

Raymond L. Hovis, York, for appellants.

Thomas J. Bradley, Philadelphia, for Warren Mfg., appellee.

Before McEWEN, P.J., and SCHILLER and BROSKY, JJ.

SCHILLER, Judge.

Appellants, Rickey L. Riley, Joan M. Riley and Coby Riley, bring this appeal from the judgment entered by the Court of Common Pleas of York County on a directed verdict in favor of appellee Warren Manufacturing, Inc. We affirm.

FACTS:

The facts in this case are not in dispute. Appellee Warren Manufacturing, Inc. ("Warren") is a manufacturer of bulk feed trailers which are used to transport animal feed from suppliers to various farms. Warren equips its trailers with an airlock device, manufactured by A.W. Stauffer & Sons ("Stauffer"), which forces the feed from the trailer through a discharge tube located at the rear of the truck. The airlock mechanism consists of eight blades or vanes that rotate at a high speed in order to expel the feed. These blades are located 6¾ inches from the end of the discharge tube. A steel hose or "elbow" is attached to the discharge tube to prevent the feed from blowing in all directions. Agricultural Commodities, Inc. ("AgCom") used such a bulk feed trailer, which it had purchased from Warren, to supply its customers with bulk feed.

On August 2, 1991, James Krichten, an employee of AgCom was operating the bulk feed trailer. Krichten's grandson, Coby Riley, ("Coby") accompanied him as he made his regular stops to deliver the feed. When Krichten and Coby returned to AgCom, Krichten activated the airlock in order to discharge residue. At the same time, Coby placed his fingers into the discharge tube, making contact with the blades of the airlock device. As a result, Coby had his left index, middle, and ring finger, along with the tip of his left pinky cut off. Surgeons were able to re-attach his index and middle fingers; Coby's ring finger was not located.

Appellants sued AgCom, Stauffer and Warren. AgCom and Stauffer settled with appellants before trial; the case proceeded to trial against Warren on the sole theory of products liability. Appellants contended that the design of the trailer was defective because the opening to the airlock was unguarded and unsafe. At the close of appellants' evidence, Warren moved for a compulsory non-suit, which was denied. However, after presenting its case, Warren moved for a directed verdict, which was granted. The basis of the directed verdict was that appellants failed to prove that the bulk-feed trailer was unreasonably dangerous. Appellants' motions for post-trial relief were denied and this appeal followed.

DISCUSSION:

The issue in this case is whether the trial court erred in directing a verdict in favor of appellee on the ground that the trailer design was not "unreasonably dangerous."

 In reviewing a trial court's decision to direct a verdict in favor of a defendant, we must view the evidence presented in the light most favorable to plaintiff and determine whether plaintiff failed to prove his case as a matter of law. *Edwards v. Brandywine Hospital*, 438 Pa.Super. 673, 678, 652 A.2d 1382, 1384 (1995). If a jury could have reasonably concluded on the basis of the evidence and all reasonable inferences therefrom that liability should rest with the appellee, then the decision to direct a verdict must be reversed. *Lattanze v. Silverstrini*, 302 Pa.Super. 217, 220, 448 A.2d 605, 606 (1982). In examining the trial court's determination to direct verdict, our standard of review is plenary, as it is with any review of questions of law. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 130, 665 A.2d 1167, 1170 (1995).

 Court control of jury action in products liability cases is more extensive than in an ordinary negligence action. *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 47, 485 A.2d 408, 422 (1984). In *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 558, 391 A.2d 1020, 1026 (1978), the Supreme Court held that it is a judicial function to decide whether, under the plaintiff's version of the facts, recovery would be

justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint. *Id.* at 558, 391 A.2d at 1026.

In products liability cases, § 402A of the Restatement (Second) of Torts has been adopted as the law of this Commonwealth, *Webb. v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966), and to prevail, the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm. *Ellis v. Chicago Bridge & Iron Co.* 376 Pa.Super. 220, 235, 545 A.2d 906, 909 (1988).[1] The threshold inquiry in all products liability cases is whether there is a defect. *Dambacher, supra* at 52, 485 A.2d at 425. This threshold can be crossed in one of two ways: either by proving a breakdown in the machine or a component thereof, traditionally known as a manufacturing defect; or in cases where there is no breakdown, by proving that the design of the machine results in an unreasonably dangerous product, traditionally known as a design defect. *See Ellis v. Chicago Bridge & Iron Co., supra.* The latter is the issue that is before us in this case.

The question of whether a product is unreasonably dangerous is a question of law. *Azzarello, supra* at 556, 391 A.2d at 1026. In answering this question a court is essentially making a social policy determination and acting as both a social philosopher and a risk-utility economic analyst. *Fitz-*

1. § 402A reads in full as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without a substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Restatement (Second) of Torts, § 402A (1965).

*patrick v. Madonna,* 424 Pa.Super. 473, 476, 623 A.2d 322, 324 (1993).[2] In *Dambacher, supra,* this Court identified certain factors to consider in making this determination:

> [T]he gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design. (citation omitted).

*Id.* at 50 n. 5, 485 A.2d at 423 n. 5. The Court also cited to additional factors, which included:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

> (2) The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.

> (3) The availability of a substitute product which would meet the same need and not be as unsafe.

> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

> (5) The user's ability to avoid danger by the exercise of care in the use of the product.

> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

**2.** In *Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 558, 391 A.2d 1020, 1026 (1978), the Court stated:

> The mere fact that we have approved Section 402A, and even if we agree that the phrase "unreasonably dangerous" serves a useful purpose in predicting liability in this area, it does not follow that this language should be used in framing the issues for the jury's consideration. Should an ill-conceived design which exposes the user to the risk of harm entitle one injured by the product to recover? Should adequate warnings of the dangerous propensities of an article insulate one who suffers injuries from those propensities? When does the utility of a product outweigh the unavoidable danger it may pose? These are questions of law and their resolution depends upon social policy.

*Id.* at 557, 391 A.2d at 1026.

(7) The feasibility on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

These additional factors were derived from an article by Dean John Wade of Vanderbilt University, "On the Nature of Strict Tort Liability for Products," 44 Miss.L.J. 825, 837–38 (1973).

It is appellants' contention that the appellee was required to persuade the Court as a matter of law on each of the 7 factors identified by Wade in determining whether a product is unreasonably dangerous.[3] We disagree. The above factors are merely suggestions for the Court to consider when making its social policy analysis.

■ In the instant case, the trial court considered the *Azzarello* standard as well as the "Wade factors" outlined in *Dambacher,* and held as a matter of law that the bulk feed trailer was not unreasonably dangerous.[4] For the following reasons we agree with the trial court's conclusion.

Appellants offered the testimony of Dr. Charles Batterman as an expert in the area of engineering design, human factors and safety engineering. Although Dr. Batterman testified that in his opinion the trailer was unsafe because the blade vanes were easily accessible to anybody who put their hands

**3.** Appellants rely on *Shetterly v. Crown Controls Corp.,* 719 F.Supp. 385 (W.D.Pa.1989), *aff'd,* 898 F.2d 142 (3rd Cir.1990), for this proposition. There, the federal court stated: "This trial court is of the opinion that the list of factors approved by the Superior Court in *Dambacher* [336 Pa.Super. 22, 485 A.2d 408 (1984)] ... are the most appropriate guidance for this trial court to use in making the determination as to whether or not the utility of (the product) outweighs the danger inherent in its use."

However, nowhere in this case, or subsequent cases, does the federal court hold that each of the 7 factors must be proven. They are merely factors to be considered in the Court's overall social policy analysis.

**4.** We note that the social utility of the bulk-feed trailer at issue here was undisputed. Robert Ross McEllhiney, who was qualified as an expert in animal feed manufacturing and transportation of animal feeds, testified that bulk feed trucks were developed in the late 1950's, primarily for the purpose of delivering feeds from the producing plants to the customer. The advantages of the bulk-feed trailer are that it can haul bulk commodities more conveniently to the farmers and can reduce the price of feed by $25 to $35 a ton.

into the discharge tube, and that the opening to the discharge tube was completely unguarded, he nevertheless conceded that there was no reason to put a hand inside the discharge tube. Further, appellants offered no evidence of other injuries involving an airlock, and Russell D. Warren, owner of Warren Manufacturing, testified that he knew of no such injuries.[5]

Based on the above summarized testimony, the trial court concluded: "There simply is not any evidence in the record that this type of injury was likely to occur." Slip. Op. *Riley v. Warren,* Court of Common Pleas of York County, No. 92 SU 000001 01, November 9, 1995, p. 23. The evidence established that a person could not be injured without placing a hand into the discharge tube, and that there was no reason to place a hand into the discharge tube while the machine was engaged. Thus, the evidence did not demonstrate that the trailer was unsafe as designed for its intended use.[6]

Dr. Batterman also offered eight design considerations that he contended could have prevented someone from contacting

5. We reject appellants' argument that the trial court erred in considering the lack of evidence of other injuries because the trailer was custom designed to fit AgCom's specifications. The trial court relied on Mr. Warren's testimony that while certain properties of the trailer were customized for AgCom, the basic structure of the trailer, and the location of the airlock/discharge tube was the standard in the industry.

6. Appellants also argued that the trailer was defective because Warren never included safety information or directions on how to clean out the airlock. Comment (j) to § 402A states, in relevant part: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." *See Ellis v. Chicago Bridge & Iron Co.,* 376 Pa.Super. 220, 229, 545 A.2d 906, 911 (1988). The necessity of a warning or instructions by the manufacturer depends in part upon the knowledge of the "ordinary consumer who purchases it, with the ordinary knowledge common to the community" as to the characteristics of the product. *Id.* In this case, the hazard in question, i.e., the blades, was obvious and known to the commercial grain haulers who used the product. Masser and Krichten both testified that they were aware of the proper method to clean the airlock and only used their hands to save time and only after they made sure that the blower was turned off before doing so. Further, Krichten testified that he warned Coby prior to the accident not to put his fingers in the discharge tube. Therefore, warnings or instructions would not have prevented Coby's accident.

the blade vanes if he or she put their hands into the discharge tube: [7] 1) a screen at the opening tube; 2) a longer discharge tube so that a hand could not reach the blades, 4) a curved tube, 5) an "interlock" that would not allow the blades to turn unless you inserted something (like an "elbow") into the tube; 6) a spring-loaded door at the end of the tube; 7) a hinged pipe extension to the tube; 8) a flexible piece of tubing permanently attached to the end of the tube. However, Dr. Batterman did not conduct any tests or show any blueprints, to determine whether any of his suggestions were feasible or cost efficient. Indeed, on cross-examination, he conceded that some of his suggestions were impractical. Dr. Batterman further testified that he had never examined a bulk-feed trailer besides the one in this case, and, in evaluating the possible alternatives, he considered neither the total use of the product, nor the effect his suggestions would have on the utility of the bulk feed trailer.

The trial court was not impressed with appellants' expert due to his lack of familiarity with the product in question and the "speculative" nature of his testimony. Essentially, the court concluded that this evidence was inadequate as a matter of law to show that the product was unreasonably dangerous.[8] We agree and detect no error in the court's resolution of this issue.

However, even if the judge had erred in peremptorily taking the issue of whether the trailer was unreasonably dangerous from the jury, there was an alternative basis for doing so; and on this alternative basis the trial court's deci-

---

7. In *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 51, n. 6, 485 A.2d 408, 423, n. 6 (1984), this Court stated that a trial court could weigh the availability of feasible alternatives as part of its social policy analysis.

8. Appellants also argue that the trial court failed to view the evidence in a manner most favorable to the appellants when there were credibility and disputed factual issues regarding design alternatives which should have been left to the jury to decide. This is not correct. The trial judge here ruled that, even accepting appellants' expert testimony as true, it still did not satisfy this burden.

sion to direct a verdict was correct.[9]

In *Schriner v. Pennsylvania Power and Light Co.,* 348 Pa.Super. 177, 501 A.2d 1128 (1985), this Court held:

> When we distill § 402A into its constituent elements, we find that the following are necessary to an appropriate application of this section:
>
> 1. a product;
> 2. a sale of that product;
> 3. a user or consumer;
> 4. defective condition, unreasonably dangerous; and
> 5. causation—that the product caused physical harm to the ultimate user or consumer or to his property.
>
> **and if any of these requisite elements remain unsatisfied, § 402A has no applicability.**

*Id.* at 185, 501 A.2d at 1132 (emphasis added). Consequently, in order to prove a claim under § 402A, a plaintiff must prove, *inter alia,* that he is a user or consumer of the product.

The commentary to the Restatement defines "user" as follows:

> "User" includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.
>
> . . . .
>
> Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Comment *l.* Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There

9. An appellate court may affirm the decision of the trial court if it is correct on an alternative basis. *Matos v. Rivera,* 436 Pa.Super. 509, 515, 648 A.2d 337, 340 (1994).

may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers.

RESTATEMENT (2d) TORTS § 402A, Comments (*l*) and (*o*).

Appellants contend that Coby was a user of the trailer merely "by coming into contact with the trailer and being injured while in its proximity." (Appellant's Brief, p. 26). Their argument can be summarized as follows: because it was "foreseeable" that someone might place their hand inside the discharge tube and come in contact with the blades, anyone who does so, is, *a priori*, a "user," and should recover because it is "the foreseeability that certain acts or injuries will occur" which determines who is a user of a product.

 However, it is inappropriate to discuss foreseeability, a negligence principal, when analyzing a products liability theory.[10] *See Dambacher, supra* at 55, 485 A.2d at 425

10. The distinction in Pennsylvania between products liability and negligence was aptly explained in *Griggs v. BIC Corp.*, 981 F.2d 1429 (3rd Cir.1992):

> In strict liability, the focus is on a defect in the product, regardless of fault, [*Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 515 Pa. 334, 341, 528 A.2d 590, 593 (1987) ], and that defect is determined in relation to a particular subset of the general population: the intended user who puts the product to its intended use. In negligence, the focus is on the reasonableness of a defendant's conduct, *Id.*, and this reasonableness is determined in relation to a different subset of the general population, and that is conceivably broader: anyone who foreseeably may be subject to an unreasonable risk of foreseeable harm.

> In strict liability, the plaintiff need not show fault, but only prove a product defect. A product cannot be defective when its design and performance meet all of the requirements of the intended user, regardless of the foreseeability of misuse by unintended users. In negligence, the plaintiff must prove fault of the manufacturer, which is an element not required in strict liability law. The scope of inquiry, however, expands because of the duty to unintended but foreseeable users.

(§ 402A "does not import negligence principles into a strict liability case, but rather prevents a supplier sued in strict liability from being held liable as an insurer instead of as a guarantor."); *Lewis v. Coffing Hoist Div., Duff–Norton Co.,* 515 Pa. 334, 341, 528 A.2d 590, 593 (1987) ("negligence concepts have no place in a case based on strict liability"); *Berkebile v. Brantly Helicopter Corporation,* 462 Pa. 83, 97, 337 A.2d 893, 900 (1975) ("Foreseeability is not a test of proximate cause [under strict liability]; it is a test of negligence."); *Kimco Development v. Michael D's Carpet,* 536 Pa. 1, 637 A.2d 603 (1993) (underlying purpose of strict product liability is undermined by introducing negligence concepts into it); *Childers v. Power Line Equipment Rentals,* 452 Pa.Super. 94, 681 A.2d 201 (1996) (Supreme Court has been adamant that negligence concepts have no place in a strict liability action); *Metzgar v. Playskool, Inc.,* 30 F.3d 459, 463 (3rd Cir.1994).

 Simply put, foreseeability is a factor of the "reasonable man" standard in negligence and has no place in a products liability case. *Berkebile, supra* at 97, 337 A.2d at 900. To allow a jury to consider the foreseeable consequences of a manufacturer's actions and knowledge would undermine the policy considerations that have continuously led the Supreme Court to hold that a manufacturer is not an insurer of his product's safety. *Id.* Indeed, the term "unreasonably dangerous" was included in § 402A specifically to obviate any contention that a manufacturer of a product with inherent possibilities of harm would become automatically responsible for every harm that could conceivably happen from the use of the product. *Dambacher, supra* at 53, 485 A.2d at 425. Strict products liability law is premised on the concept of enterprise liability for casting a defective product into the stream of commerce, *Kimco, supra;* because manufacturers market their product for use and because they have a better opportunity to control the defect, they should be responsible for injuries to those who ultimately use or consume their product. The focus is on the nature of the product and **the consumer's**

*Id.* at 1438.

reasonable expectations with regard to the product. *Id.* at 7, 637 A.2d at 605 (1993) (emphasis added). In retrospect, any possible harm is foreseeable. However, we do not want to conflate the "foreseeable user" with the "intended user" as there are many products which are dangerous to a foreseeable user but would be rendered significantly less useful if they were made injury-proof. *See Metzgar, supra.* Thus, the relevant inquiry foreseeability of harm, but whether that harm was to an intended user.

Recently, the Third Circuit had occasion to discuss specifically who is an "intended user." In *Griggs v. BIC Corp.,* 981 F.2d 1429 (3rd Cir.1992), the Third Circuit held that a child could not recover under Pennsylvania products liability law for injuries caused by a lighter which was not defective because children were not intended users of the lighter.[11] The Circuit Court based this holding on *Azzarello, supra,* where the Supreme Court stated that a product is defective when it leaves "the supplier's [or manufacturer's] control lacking any element necessary to make it safe for its *intended use* or possessing any feature that renders it unsafe for the *intended use.*" *Id.* at 559, 391 A.2d at 1027 (emphasis added). The Circuit Court held that this concept of intended use *a fortiori* included the participation of an intended user using a product for its intended use. *Griggs,* at 1433.

In *Klemka v. Bic,* 1996 WL 571753, 99 U.S.Dist. Lexis 15395 (E.D.Pa.1996), the learned federal district court judge for the Eastern District of Pennsylvania further elucidated this distinction by setting forth a test which we find helpful in our discussion today: "Would an ordinary consumer have objectively understood that the manufacturer of the product intended it to be used by certain persons, not others? Put another way, if a person was a 'reasonably obvious unintended user,' the product used by that person would not have been employed for an 'intended use.'" *Id.* 1996 WL 571753 at *2, at *4 (citations omitted).

11. The Court did note that the manufacturer may have had a duty under negligence principles to manufacture childproof lighters if it was foreseeable that children would use the lighters to start fires.

The decisions in *Griggs,* and *Klemka* are consistent with *Ellis v. Chicago Bridge & Iron Co., supra,* where this Court held that the test to determine whether a seller has a duty to place a warning on his product depends upon "the knowledge and realization of the danger that would be possessed by the **ordinary consumer who purchases or uses the product.**" *Id.* at 229, 545 A.2d at 911 (citation omitted) (emphasis omitted in the original) (emphasis added).[12] In *Ellis,* the victim was a longshoreman who was killed when a large, heavy steel plate slid out of the chains that were used to carry it. This Court held that the manufacturer of the plates could not be held strictly liable for failing to provide shipping instructions, warnings or devices to assist them in lifting the plates because the danger attendant to moving large steel plates was "obvious to all parties involved." *Id.* at 237, 545 A.2d at 915. Judge Popovich, in a concurring statement, opined that the plaintiff should have been denied recovery because an intermediate shipper was not a member of the class of ultimate users or consumers which § 402A was developed to protect, and therefore an employee of the shipper should not be entitled to pursue a claim in strict liability. As part of his analysis, Judge Popovich cogently observed that the language "ultimate user or consumer" is pervasive throughout products liability case law. *Id.* at 238, 545 A.2d at 916 (citations omitted). Indeed, § 402A specifically refers to the user or consumer of a product:

§ 402A. Special Liabilty of Seller of Product for Physical Harm to **User or Consumer**

(1) One who sells any product in a defective condition unreasonably dangerous to **the user or consumer** or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

12. Additionally, we note that this analysis comports with the law in other jurisdictions: *Cottom v. McGuire Funeral Service,* 262 A.2d 807 (D.C.App.1970); *Todd v. Societe,* 21 F.3d 1402 (7th Cir.1994), *cert. den.* 513 U.S. 947, 115 S.Ct. 359, 130 L.Ed.2d 312 (1994); *Spellmeyer v. Weyerhaeuser Corp.,* 14 Wash.App. 642, 544 P.2d 107 (1975); *Borchert v. E.I. Dupont De Nemours and Co.,* 886 F.Supp. 629 (W.D.Mich.1995).

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach **the user or consumer** without a substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) **the user or consumer** has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts, § 402A (1965) (emphasis added)

In the present case Coby was clearly, in the words of the Court in *Klemka,* a "reasonably obvious unintended user." *Klemka, supra* 1996 WL 571753 at *2, at *5. The trailer was a sophisticated piece of industrial machinery, to be used by an educated group of industrial consumers. Its normal and intended use was to be by the trained employees of AgCom who were responsible for hauling the bulk feed to farms. All the expert witnesses agreed, including appellants' expert, that the trailer was not intended to be used by or around children.

Thus, the trial court correctly concluded that AgCom and its employees, as the consumers and operators of the product, were the "users" who were afforded protection under § 402A. Because a child was never the intended consumer of the product and had no reason to come in contact with it, Coby was clearly an "obvious unintended user." Consequently, § 402A relief was not available to him.

In summary, any motorized vehicle carries certain substantial risks to the user, and such products are not unreasonably dangerous merely because they may be involved in accidents or because an operator may be injured during their use. *See Monahan v. Toro Co.,* 856 F.Supp. 955, 963 (E.D.Pa.1994). Additionally, there are certain risks that as a matter of law, or social policy, cannot support imposition of strict liability. *Dambacher, supra* at 49, 485 A.2d at 422. To hold Warren strictly liable to someone who was not an intend-

ed user, who was injured by a product which was not unreasonably dangerous, would effectively make Warren the insurer of that person. This was not the intent of the Supreme Court in adopting Restatement (Second) of Torts, § 402A.

CONCLUSION:

Here the benefits of the trailer were clear, no feasible alternatives were shown to exist, the trailer was not defective, and there was no evidence that a risk of injury existed for intended users using the machine for its intended use. Hence, the trial court did not err in directing the verdict in favor of appellee.

Consequently, the judgment entered by the Court of Common Pleas of York County is affirmed.